**LIFSHITZ & MILLER LLP**
Joshua M. Lifshitz
821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
Email: jml@jlclasslaw.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RICHARD K. MASER, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TIMOTHY M. RING, DAVID M. BARRETT, ROBERT M. DAVIS, HERBERT L. HENKEL, JOHN C. KELLY, DAVID F. MELCHER, GAIL K. NAUGHTON, TOMMY G. THOMPSON, JOHN H. WEILAND, ANTHONY WELTERS, TONY L. WHITE, C. R. BARD, INC., BECTON, DICKINSON AND COMPANY and LAMBDA CORP.,<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Richard K. Maser ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.    This action is brought as a class action by Plaintiff on behalf of himself and the other public shareholders of C. R. Bard, Inc. ("Bard" or the "Company") against Bard and the members of Bard's Board of Directors (the "Board") for their violations of Sections 14(a) and

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed sale of Bard to Becton, Dickinson and Company ("Parent") and Lambda Corp. ("Merger Sub," together with Parent, "BD").

2.      On April 23, 2017, Bard announced that it had entered into a merger agreement (the "Merger Agreement"), pursuant to which Merger Sub will merge with and into Bard, with Bard surviving as a wholly-owned subsidiary of Parent (the "Proposed Transaction").

3.      Pursuant to the terms of the Merger Agreement, Bard stockholders will receive $222.93 per share in cash and 0.5077 shares of BD for each share of Bard common stock that they own (the "Merger Consideration"). The Merger Consideration is insufficient and undervalues the Company and is the result of a flawed sales process.

4.      On May 23, 2017, in order to convince Bard's stockholders to vote in favor of the Proposed Transaction, the Board, jointly with BD, authorized the filing of a materially incomplete and misleading Registration Statement on Form S-4 with the SEC (the "S-4" or "Registration Statement") by BD, in violation of Sections 14(a) and 20(a) of the Exchange Act.  In particular, the S-4 contains materially incomplete and misleading information concerning, among other things: (i) financial projections for the Company; (ii) financial projections prepared by BD's financial advisors, Perella Weinberg Partners LP ("Perella Weinberg") and Citigroup Global Markets Inc. ("Citi"); (iii) the valuation analyses performed by Bard's financial advisor, Goldman Sachs & Co. ("Goldman"), in support of its fairness opinion; and (iv) any conflicts of interest involving Bard's or BD's financial advisors.

5.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Bard, the Board and BD for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule

14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Bard stockholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder and Section 20(a) of the Exchange Act.

7.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Bard is incorporated in New Jersey and maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

9.      Plaintiff Richard K. Maser ("Plaintiff") is, and at all relevant times has been, a

continuous stockholder of Bard.

10.    Defendant Timothy M. Ring ("Ring") has been a member of the Board since 2003 and the Chairman and Chief Executive Officer ("CEO") of the Company since August 2003. Defendant Ring is also a member of the Executive Committee.

11.    Defendant David M. Barrett ("Barrett") has been a member of the Board since 2009 and is a member of the Audit Committee, Regulatory Compliance Committee and the Science and Technology Committee.

12.    Defendant Robert M. Davis ("Davis") has been a member of the Board since 2015 and is a member of the Audit Committee, Finance Committee and the Science and Technology Committee.

13.    Defendant Herbert L. Henkel ("Henkel") has been a member of the Board since 2002 and is a member of the Compensation Committee, Executive Committee, Finance Committee and the Governance Committee.

14.    Defendant John C. Kelly ("Kelly") has been a member of the Board since 2009 and is the Chair of the Audit Committee and the Interim Chair of the Finance Committee.

15.    Defendant David F. Melcher ("Melcher") has been a member of the Board since 2014 and is a member of the Audit Committee, Compensation Committee and the Finance Committee.

16.    Defendant Gail K. Naughton ("Naughton") has been a member of the Board since 2004 and is the Chair of the Science and Technology Committee.  Defendant Naughton is also a member of the Governance Committee and the Regulatory Compliance Committee.

17.    Defendant Tommy G. Thompson ("Thompson") has been a member of the Board since 2005 and is a member of the Governance Committee, Regulatory Compliance Committee,

and the Science and Technology Committee.

18.     Defendant John H. Weiland ("Weiland") has been the President and Chief Operating Officer ("COO") of the Company since August 2003 and a member of the Board since 2005.  Defendant Weiland has been the Vice Chairman of the Board since August 2016.

19.     Defendant Anthony Welters ("Welters") has been a member of the Board since 1999 and is the Chair of the Regulatory Compliance Committee.  Defendant Welters is also a member of the Compensation Committee and the Governance Committee.

20.     Defendant Tony L. White ("White") has been a member of the Board since 1996 and is the Chair of the Governance Committee and a member of the Compensation Committee and the Executive Committee.

21.     Defendants Ring, Barrett, Davis, Henkel, Kelly, Melcher, Naughton, Ring, Thompson, Weiland, Welters and White are collectively referred to herein as the "Individual Defendants."

22.     Defendant C. R. Bard, Inc. ("Bard" or the "Company") is a New Jersey corporation with its principal executive offices located at 730 Central Avenue, Murray Hill, New Jersey 07974.

23.     Defendant Becton, Dickinson and Company ("Parent") is a New Jersey corporation with its principal executive offices located at 1 Becton Drive, Franklin Lakes, New Jersey 07417.

24.     Defendant Lambda Corp. ("Merger Sub") is a New Jersey corporation and a wholly-owned subsidiary of Parent.

25.     Defendants Parent and Merger Sub are collectively referred to herein as "BD."

26.     The Individual Defendants, Bard and BD are collectively referred to herein as the "Defendants."

**CLASS ACTION ALLEGATIONS**

27.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Bard (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

28.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. As of April 20, 2017, there were approximately 72,437,191 shares of Bard common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country. The actual number of public stockholders of Bard will be ascertained through discovery.

b.     There are questions of law and fact that are common to the Class, including the following:

i.     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act and SEC Rules and Regulations including Rule 14a-9;

ii.     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii.     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

29.      Bard, together with its subsidiaries, designs, manufactures, packages, distributes, and sells medical, surgical, diagnostic, and patient care devices worldwide in the fields of vascular, urology, oncology and surgical specialty products.  The Company sells its products directly to hospitals, individual healthcare professionals, extended care facilities, and alternate site facilities through hospital/surgical supply and other medical specialty distributors. Bard was founded in 1907 and is headquartered in Murray Hill, New Jersey.

30.      On January 26, 2017, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing the Company's financial results for the fourth quarter of 2016.  The press release stated, in pertinent part:

**BARD ANNOUNCES FOURTH QUARTER RESULTS**

**MURRAY HILL, NJ** — (January 26, 2017) — C. R. Bard, Inc. (NYSE: BCR) today reported 2016 fourth quarter financial results. Fourth quarter 2016 net sales were $967.1 million, an increase of 11 percent on an as-reported basis over the

prior-year period. Excluding the impact of foreign exchange, fourth quarter 2016 net sales increased 12 percent over the prior-year period.

For the fourth quarter 2016, net sales in the U.S. were $655.0 million and net sales outside the U.S. were $312.1 million, an increase of 8 percent and 18 percent, respectively, over the prior-year period. Excluding the impact of foreign exchange, fourth quarter 2016 net sales outside the U.S. increased 21 percent over the prior-year period.

Net sales for the full year 2016 were $3,714.0 million, an increase of 9 percent over the prior-year period on an as-reported basis. Excluding the impact of foreign exchange, full year 2016 net sales increased 10 percent over the prior-year period. For the fourth quarter 2016, net income was $159.6 million and diluted earnings per share were $2.11, an increase of 17 percent and 18 percent, respectively, as compared to fourth quarter 2015 results. Adjusting for amortization of intangibles and certain items that affect comparability between periods as detailed in the tables below, fourth quarter 2016 net income was $208.6 million and diluted earnings per share were $2.77, an increase of 13 percent and 14 percent, respectively, as compared to fourth quarter 2015 results.

For the full year 2016, net income was $531.4 million and diluted earnings per share were $7.03, an increase of 292 percent and 297 percent, respectively, as compared to full year 2015 results. Adjusting for amortization of intangibles and certain items that affect comparability between periods, full year 2016 net income was $777.3 million and diluted earnings per share were $10.29, an increase of 12 percent and 13 percent, respectively, as compared to full year 2015 results.

31.     In the January 26, 2017 press release, defendant Ring, the Company's Chairman and CEO, stated, in pertinent part:

Our strong performance in 2016 once again demonstrated the effectiveness of the execution of our strategic investment plan. We are seeing a broad contribution to growth across our portfolio, from each of our four businesses both domestically and internationally. We remain in investment mode and continue to focus on providing shareholders with above-average revenue growth and attractive profitability.

32.     On April 23, 2017, the Company issued a press release announcing its financial results for the first quarter of 2017.  The press release stated, in pertinent part:

**Bard Announces First Quarter Results**

MURRAY HILL, N.J.--(BUSINESS WIRE)--Apr. 23, 2017-- C. R. Bard, Inc. (NYSE:BCR) today reported 2017 first quarter financial results, prior to their previously communicated schedule. The company has included supplemental

financial data on its website related to this earnings release. Given the transaction announced with Becton, Dickinson and Company (NYSE:BDX) today, and the associated conference call tomorrow, the company is cancelling the previously scheduled earnings conference call on April 26, 2017.

First quarter 2017 net sales were $938.8 million, an increase of 7 percent on an as-reported basis over the prior-year period. Excluding the impact of foreign exchange, first quarter 2017 net sales increased 8 percent over the prior-year period. Divested products and acquisitions in the last twelve months favorably impacted net sales growth by approximately 70 basis points.

For the first quarter 2017, net sales in the U.S. were $657.2 million and net sales outside the U.S. were $281.6 million, an increase of 5 percent and 14 percent, respectively, over the prior-year period. Excluding the impact of foreign exchange, first quarter 2017 net sales outside the U.S. increased 17 percent over the prior-year period.

For the first quarter 2017, net income was $178.1 million and diluted earnings per share were $2.37, an increase of 53 percent and 54 percent, respectively, as compared to first quarter 2016 results. Adjusting for amortization of intangibles and certain items that affect comparability between periods as detailed in the tables below, first quarter 2017 net income was $215.4 million and diluted earnings per share were $2.87, an increase of 22 percent and 23 percent, respectively, as compared to first quarter 2016 results.

In conjunction with the first quarter results, the company is also updating financial guidance for the full year and providing financial guidance for the second quarter of 2017. For the full year 2017, net sales are now forecasted to increase between 5 percent and 6 percent on an as-reported basis. Excluding the impact of foreign exchange, full year 2017 net sales are forecasted to increase between 6 percent and 7 percent over 2016. Full year 2017 diluted earnings per share, after adjusting for amortization of intangibles and certain items that affect comparability between periods, are projected to be between $11.65 and $11.90, representing growth between 13 percent and 16 percent compared to full year 2016 results.

For the second quarter 2017, net sales are forecasted to increase between 4 percent and 5 percent on an as-reported basis. Excluding the impact of foreign exchange, second quarter 2017 net sales are forecasted to increase between 6 percent and 7 percent over second quarter 2016. Second quarter 2017 diluted earnings per share, after adjusting for amortization of intangibles and certain items that affect comparability between periods, are projected to be between $2.75 and $2.85, representing growth between 8 percent and 12 percent compared to second quarter 2016 results.

## **The Flawed Process Leading to the Proposed Transaction**

33.     On May 23, 2017, BD filed the S-4 with the SEC which was jointly prepared by Defendants in connection with the Proposed Transaction and contained information concerning, *inter alia*, the background of the merger, as follows:

34.     In the spring of 2016, BD's senior management began to review of a number of larger potential acquisition targets, including Bard.  The S-4 fails to disclose how BD identified Bard as a potential acquisition target or the reasons for selecting Bard as a target.

35.     On January 3, 2017, Vincent Forlenza ("Forlenza"), the Chairman and CEO of BD, reached out to defendant Ring, Chairman and CEO of Bard, and the two agreed to meet on January 26, 2017.

36.     On January 13, 2017, the BD board of directors met to review potential strategic transactions, including a potential transaction with Bard. Representatives of BD's financial advisor, Perella Weinberg Partners ("Perella Weinberg"), and BD's outside counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), attended the meeting.

37.     On January 23, 2017, the BD board of directors authorized Forlenza to submit a preliminary, non-binding indication of interest to Bard at or following the January 26, 2017 meeting for $300 per share of Bard common stock, consisting of a combination of cash and shares of BD common stock.

38.     At the January 26, 2017 meeting, Forlenza indicated that BD might be interested in exploring a potential merger between Bard and BD. Defendant Ring responded that Bard was not considering a sale of the company at such time and was executing its own standalone plan for growth, both organically and through acquisitions, and that the plan was supported by the Bard Board.

39.     On January 27, 2017, defendant Ring informed Bard's independent lead director of

BD's interest in a potential merger with Bard.

40.     On January 31, 2017, Forlenza sent to defendant Ring a written, preliminary, non-binding indication of interest for a transaction in which BD would acquire Bard for $300 per share of Bard common stock, consisting of approximately 68% in cash and 32% in BD common stock.  That same day, defendant Ring informed Bard's independent lead director that Bard had received BD's written indication of interest.  The rest of the members of Bard's Board were informed between February 2 and 3, 2017.

41.     On February 8, 2017, Bard's Board met to discuss BD's proposal with Bard's financial advisor, Goldman, and Bard's outside counsel, Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton").  Bard's Board concluded that BD's proposal for $300 per share of Bard common stock was insufficient and authorized defendant Ring to tell BD that Bard's Board supported Bard's standalone plan.  The S-4 fails to disclose what price and combination of stock and cash would have been sufficient and whether the Board had a predetermined price in mind in order to engage in a transaction with BD or another company.

42.     On February 9, 2017, defendant Ring informed Forlenza of Bard's Board's decision.

43.     Forlenza informed BD's board of directors of Bard's decision on February 13, 2017 and the BD board of directors determined to cease consideration of a possible transaction with Bard.

44.     On February 14, 2017, a representative of Perella Weinberg, BD's financial advisor, reached out to Christopher Holland ("Holland"), Senior Vice President and CFO of Bard concerning the discussion between defendant Ring and Forlenza.  Holland informed Perella Weinberg that BD would need to make a significant increase in its proposed price.

45.     On March 3, 2017, the BD board of directors met and authorized Forlenza to submit a revised preliminary, non-binding indication of interest at a price of $312 per share, consisting of approximately 67% in cash and 33% in BD common stock.  The revised proposal was sent to defendant Ring on March 6, 2017.  The revised proposal also indicated that BD would operate Bard's business as a separate segment and would consider adding an unspecified number of members of the Bard Board to the BD board of directors.  BD also requested to begin due diligence.  The S-4 fails to disclose how BD determined the $312 per share offer as well as the percentages of cash and stock that made up the offer.

46.     On March 8, 2017, Bard's Board held a special meeting to discuss BD's revised proposal. Bard's Board determined that BD's revised proposal was insufficient, but authorized Bard's senior management to continue exploring a potential transaction with BD, including by allowing BD to conduct limited due diligence.  That same day, defendant Ring informed Forlenza of Bard's Board's decision.

47.     On March 11, 2017, Bard and BD entered into a mutual non-disclosure agreement ("NDA"), which contained a standstill provision.  The S-4 fails to disclose the March 11, 2017 NDA.

48.     On March 13, 2017, Bard and BD met to commence due diligence.

49.     On March 21, 2017, the BD board of directors met to further discuss the status of BD's ongoing consideration of the possible transaction with Bard.  The BD board determined that BD should obtain Bard's consent, pursuant to the non-disclosure agreement, to engage Citigroup Global Markets Inc. ("Citi") to provide financing, which Bard consented to.

50.     Between March 27 and 28, 2017, the BD board of directors met to further discuss the status of BD's ongoing consideration of the possible transaction with Bard.

51.    Also on March 28, 2017, Forlenza sent to defendant Ring a revised written, non-binding, preliminary indication of interest for $314 per share of Bard common stock, of approximately 67% in cash and 33% in BD common stock.

52.    On March 29, 2017, the Bard's Board met to discuss the revised proposal.  For the first time, the Bard's Board discussed whether to solicit other proposals to acquire Bard, but ultimately decided not to solicit alternative offers.  Bard's Board then determined that BD's proposed indicative price of $314 per share of Bard common stock was insufficient, but that the Board could be supportive of a transaction with BD if the indicative price were $317 per share.

53.    On March 30, 2017, defendant Ring informed Forlenza of the Board's decision and that same day, Forlenza informed defendant Ring that BD was prepared to offer an indicative price of $317 per share of Bard common stock, with the same mix of consideration.

54.    Over the next few weeks, each of BD, Bard and their respective advisors conducted comprehensive due diligence investigations, including through an electronic data room and in-person meetings and due diligence requests.

55.    On April 4, 2017, representatives of Skadden, BD's outside counsel, delivered a draft merger agreement to representatives of Wachtell Lipton, Bard's outside counsel.  The draft merger agreement contained several provisions Bard viewed as problematic, including (i) that Bard would be required to pay BD a termination fee equal to 3.35% of the equity value of Bard; (ii) that BD potentially would want a provision that would permit it to delay the closing to raise debt financing; and (iii) that between signing and closing, Bard would not be able to take certain actions with respect to its operations without BD's prior written consent.

56.    On April 7, 2017, Bard's Board met to discuss the potential transaction with BD, including certain topics that would need to be resolved before signing a transaction agreement,

including the number of Bard directors that would join the board of the combined company, the role of certain senior management at the combined company, the role of the Bard brand at the combined company, closing conditions, termination fee amounts and triggers, regulatory approvals and employee matters. The Bard Board also considered whether it should seek to negotiate a collar on the stock portion of the merger consideration, but determined not to do so.

57. On April 11, 2017, representatives of Wachtell Lipton delivered a revised draft of the merger agreement to representatives of Skadden, which provided, among other items, that (i) Bard would be required to pay BD a termination fee of 3.0% of the equity value of Bard; (ii) BD would not be permitted to delay the closing to raise debt financing; and (iii) Bard would have additional flexibility to make acquisitions, settle litigation or incur debt between signing and closing without first obtaining BD's written consent. The revised draft merger agreement also noted that the parties' CEOs would discuss the composition of the board of the combined company.

58. On April 13, 2017, Forlenza and defendant Ring met to discuss the status of due diligence and the revised merger agreement, and the number of Bard directors who would be appointed to the board of directors of the combined company.

59. In the evening of April 14, 2017, representatives of Skadden delivered a revised draft of the merger agreement to representatives of Wachtell Lipton.

60. Between April 15 and April 19, 2017, members of Bard's and BD's senior management discussed the merger agreement, including the members of the Bard Board who would potentially be appointed to the board of directors of the combined company, the role of the Bard brand at the combined company and the roles of Bard senior management in the combined.

61. On April 19, 2017, Bard's Board met to discuss the status of the merger agreement and ongoing discussions regarding the other key transaction terms, including closing conditions,

termination rights, termination fees and employee matters. The Bard Board authorized Bard's senior management to continue negotiations with BD of a definitive agreement at an indicative price of $317 per share, consisting of approximately 67.5% cash and 32.5% BD common stock, subject to satisfactory resolution of the terms of the merger agreement.

62.    From April 19 through April 22, 2017, the parties, with the assistance of their legal and financial advisors, finalized their due diligence review and engaged in discussions and negotiations to resolve the open issues in the merger agreement, and agreed that two members of the Bard Board would be appointed to the BD board of directors after the closing. The S-4 fails to disclose which two members of Bard's Board would be appointed to the board of directors of the new company and the criteria for their selection.

63.    On April 22, 2017, the BD board of directors and senior management met with representatives of Perella Weinberg, Skadden, Citi and McCarter & English LLP ("McCarter"), BD's special New Jersey counsel.

64.    On April 22, 2017, the Bard Board met to discuss the potential transaction. Goldman reviewed the financial terms of the proposed transaction, including the final merger consideration that Bard shareholders would receive approximately $222.93 in cash and 0.5077 shares of BD common stock per share of Bard common stock, or a total of value of $317 per share of Bard common stock based on the closing price of BD common stock on April 21, 2017. Bard's Board unanimously approved the merger agreement.

## The Company Announces the Proposed Transaction

65.    On April 23, 2017, the Company issued a press release announcing the Proposed Transaction. The press release stated, in pertinent part:

**BD To Acquire Bard for $24 Billion**

15

**Will Create Highly Differentiated Medical Technology Company Focused on
Delivering Innovative Healthcare Solutions to Improve Clinical and
Economic Outcomes
Will Build on BD's Leadership Position in Medication Management and
Infection Prevention; Will Increase Opportunities in Innovative Fast-
Growing Clinical Areas; Financially Compelling Transaction; Immediately
Accretive and Expected to Generate High Single-Digit Accretion to Adjusted
EPS in Fiscal Year 2019
Tom Polen Named BD President**

FRANKLIN LAKES, N.J. and MURRAY HILL, N.J., April 23, 2017 /PRNewswire/ -- BD (Becton, Dickinson and Company) (NYSE: BDX), a leading global medical technology company, and C. R. Bard, Inc. (NYSE: BCR), a medical technology leader in the fields of vascular, urology, oncology and surgical specialty products, announced today a definitive agreement under which BD will acquire Bard for $317.00 per Bard common share in cash and stock, for a total consideration of $24 billion. The agreement has been unanimously approved by the Boards of Directors of both companies.

*        *        *

**Transaction Highlights**

Under the terms of the transaction, Bard common shareholders will be entitled to receive approximately $222.93 in cash and 0.5077 shares of BD stock per Bard share, or a total of value of $317.00 per Bard common share based on BD's closing price on April 21, 2017. At closing, Bard shareholders will own approximately 15 percent of the combined company.

BD expects to contribute approximately $1.7 billion of available cash to fund the transaction, along with, subject to market conditions, approximately $10 billion of new debt and approximately $4.5 billion of equity and equity linked securities issued to the market. Bard shareholders will also receive $8 billion of BD common stock. BD has also obtained fully committed bridge financing. At closing, BD estimates the combined company will have pro forma leverage of approximately 4.7x and is committed to deleveraging to below 3.0x leverage within three years of closing. BD expects to continue the suspension of its share repurchase program. BD is also committed to annual dividend increases while reinvesting in the business to continue to drive long-term growth.

The transaction is subject to regulatory and Bard shareholder approvals and customary closing conditions, and is expected to close in the fall of 2017.

66.     Perella Weinberg Partners LP ("Perella Weinberg") acted as the lead financial

advisor to BD for the Proposed Transaction.  Citi also acted as a financial advisor to BD and will

be providing fully committed financing for the Proposed Transaction.

67.    Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") provided legal counsel to BD for the Proposed Transaction.

68.    Goldman acted as financial advisor to Bard for the Proposed Transaction and Wachtell, Lipton, Rosen & Katz ("Wachtell") acted as legal advisor to Bard.

### The Merger Agreement's Deal Protection Provisions Deter Superior Offers

69.    In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Bard.

70.    First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Bard shareholders. The Merger Agreement generally states that the Company and the Individual Defendants shall not: (i) initiate, solicit, propose or knowingly encourage or knowingly facilitate any inquiry or the making of any proposal or offer that constitutes, or would reasonably be expected to lead to, a superior acquisition proposal; (ii) engage in, continue or otherwise participate in any discussions or negotiations relating to any acquisition proposal; or (iii) provide any non-public information to any person in connection with any acquisition proposal.

71.    Additionally, the Merger Agreement grants BD recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) several days to negotiate with Bard, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

72.    The non-solicitation and matching rights provisions essentially ensure that a

superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost and effort of making a superior proposal while knowing that BD can easily foreclose a competing bid.  As a result, these provisions unreasonably favor BD, to the detriment of Bard's public shareholders.

73.    Furthermore, the Merger Agreement contains a highly restrictive "fiduciary out" provision which permits Bard's Board to withdraw its approval of the Proposed Transaction only under exceptionally limited circumstances.

74.    Lastly, the Merger Agreement provides that Bard must pay BD a termination fee of $750 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal. The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Bard shareholders with a superior offer.

75.    Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

76.    Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Bard's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

### The S-4 Fails to Disclose and/or Misrepresents Material Information

77.    On May 23, 2017, Defendants jointly caused the S-4 to be filed with the SEC in connection with the Proposed Transaction.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  The Individual Defendants were obligated to carefully

review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Section 14(a) and 20(a) of the Exchange Act.

**Bard's Financial Projections**

78.    First, the S-4 fails to provide material information concerning the Company's financial projections.  Specifically, the S-4 provides projections for non-GAAP (generally accepted accounting principles) metrics, including EBITDA, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

79.    When a company discloses non-GAAP financial measures in a Registration Statement, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

80.    Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Bard and BD have included in the S-4 here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and

effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

81.    In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[2]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[3]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

---

[1] Mary Jo White, Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgnspeech.html.

[2] *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-thesecs evolving-views/; Gretchen Morgenson, Fantasy Math Is Helping Companies Spin Losses Into Profits, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math    is-helping-companies-spin-losses-into-profits.html?_r=0.

[3] Non-GAAP Financial Measures, Compliance & Disclosure Interpretations, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

82.    In order to make the projections included on page 79 of the S-4 materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

83.    At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculated the non-GAAP measures, including: (i) capital expenditures; (ii) changes in net working capital; (iii) net income; (iv) net earnings; (v) earnings per share; (vi) interest expense; (vii) income taxes; (viii) depreciation and amortization; (ix) amortization of intangibles; and (x) a reconciliation of all non-GAAP to GAAP metrics. Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading. Indeed, the Defendants acknowledge that disclosing non-GAAP projections may mislead shareholders in the S-4: "Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by Bard may not be comparable to similarly titled amounts used by other companies." S-4, at 79.

**BD's Financial Projections**

84.    The S-4 fails to disclose BD's financial projections, which are material as a significant portion of the merger consideration consists of BD stock to be received by Bard's shareholders.

**Goldman's *Illustrative Discounted Cash Flow Analysis***

85.    With respect to Goldman's Illustrative *Discounted Cash Flow Analysis*, the S-4 fails to disclose: (i) the range of illustrative terminal values of Bard; (ii) the inputs underlying the discount rates ranging from 6.0% to 7.0%; (iii) Goldman's basis for applying perpetuity growth rates ranging from 1.0% to 1.5%; and (iv) Bard's net debt as of December 31, 2016.

86.     The S-4 also fails to disclose why Goldman applied perpetuity growth rates ranging from 1.0% to 1.5% as the range of illustrative terminal value of Bard.

**Goldman's *Illustrative Present Value of Future Share Price Analysis***

87.     With respect to Goldman's *Illustrative Present Value of Future Share Price Analysis*, the S-4 fails to disclose: (i) projected dividends; (ii) estimated adjusted earnings per share; (iii) Goldman's basis for applying price to forward adjusted earnings per share multiples of 18.0x to 22.0x; and (iv) Goldman's basis for using inputs underlying the illustrative discount rate of 5.7%.

**Goldman's *Illustrative Selected Precedent Transactions Analysis***

88.     With respect to Goldman's *Illustrative Selected Precedent Transactions Analysis*, the S-4 fails to disclose the individual multiples and financial metrics for each of the transactions observed by Goldman , including the EV/LTM EBITDA for each company selected.

89.     The S-4 also fails to disclose why Goldman only used precedent transactions with a value greater than $4 billion after April 2011 for target companies in the medical technology industry and, within that select group, how Goldman determined which transactions to use in the *Illustrative Selected Precedent Transactions Analysis*.

**Goldman's *Implied Premia Paid Analysis***

90.     With respect to Goldman's *Implied Premia Paid Analysis*, the S-4 fails to disclose: (i) the acquisition transactions observed by Goldman in the analysis; and (ii) the implied premia paid in such transactions.

91.     The S-4 also fails to disclose for each company the closing stock price of the target company in the last day prior to the announcement of the transaction and against the 52-week stock price high of the target company as of the last day prior to the announcement of the transaction for

the *Implied Premia Paid Analysis*.

**Goldman's *Selected Publicly Traded Companies Analysis***

92.     With respect to Goldman's *Selected Publicly Traded Companies Analysis*, the S-4 fails to disclose the individual multiples and financial metrics for each of the companies observed by Goldman in the analysis, including: (i) 2017 P/E Multiples; (ii) 2017 P/E/G Multiples; and (iii) how the publicly traded companies for the analysis were selected.

93.     The S-4 also fails to disclose material information regarding potential conflicts of interest of Goldman, the Company's financial advisor for the Proposed Transaction, including Goldman's holdings in BD and/or any of BD's affiliates.  The S-4 also fails to disclose the actual fee received or to be received by Goldman from Bard.

94.     In sum, the omission of the above-referenced information renders statements in the S-4 materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**Against All Defendants for Violations of**
**Section 14(a) of the Exchange Act and Rule 14-9 Promulgated Thereunder**

95.     Plaintiff incorporates by reference each and every allegation set forth above as if fully set forth herein.

96.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

97.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that any notice of meeting or other communication with shareholders, such as the S-4, shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

98.    The omission of information from a Registration Statement providing for a notice of meeting of shareholders will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

99.    Defendants have issued the S-4 with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company and BD; (ii) the valuation analyses performed by Goldman; and (iii) any conflicts of interest of Goldman or BD's financial advisors.

100.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the S-4, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

101.    The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the S-4 states that Goldman reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Goldman as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company.

102.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review Goldman's analyses in connection with their receipt of the fairness opinion, question Goldman as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the S-4and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

103.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4. The preparation of a shareholder solicitation by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to

do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

104.    Bard is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

105.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

106.    Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

107.    Plaintiff incorporates by reference each and every allegation set forth above as if fully set forth herein.

108.    The Individual Defendants acted as controlling persons of Bard within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Bard, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

109.    Each of the Individual Defendants was provided with or had unlimited access to

copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

110.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

111.    In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

112.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

113.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

114.    Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate

and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 21, 2017                                        Respectfully submitted,


                                                                **LIFSHITZ & MILLER LLP**

                                                                */s/ Joshua M. Lifshitz*
                                                                Joshua M. Lifshitz
                                                                821 Franklin Avenue, Suite 209
                                                                Garden City, New York 11530
                                                                Telephone: (516) 493-9780
                                                                Facsimile: (516) 280-7376
                                                                Email: jml@jlclasslaw.com

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy is the subject of another class action currently pending before this Court, captioned *Tanguma v. C. R. Bard, Inc. et al.*, Case No. 2:17-cv-3977-KM-JBC (the "Tanguma Action").  The parties to the Tanguma Action are: plaintiff Barbara Stanford Tanguma, a purported shareholder of C. R. Bard, Inc.; defendants Timothy M. Ring, David M. Barrett, Robert M. Davis, Herbert L. Henkel, John C. Kelly, David F. Melcher, Gail K. Naughton, Tommy G. Thompson, John H. Weiland, Anthony Welters and Tony L. White, the board of directors of C. R. Bard, Inc.; and defendants Becton, Dickinson and Company and Lambda Corp.

I hereby certify under the penalty of perjury that the following statements made by me are true.

Dated: June 21, 2017

**LIFSHITZ & MILLER LLP**

*/s/ Joshua M. Lifshitz*_____
Joshua M. Lifshitz
821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
Email: jml@jlclasslaw.com

*Attorneys for Plaintiff*

## **CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS**

I, Richard Maserg, hereby certify that:

1.  I have reviewed the Complaint and authorized its filing for the filing of a Motion for Lead Plaintiff on my behalf.

2.  I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Bcr securities that are the subject of this litigation during the Class Period are attached hereto as Exhibit A.

5.  I have not served as or sought to serve as a representative party on behalf of a Class under this title during the last three years.

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Executed on 06/14/2017

Signature

**EXHIBIT A**

My ownership in C. R. Bard, Inc. (BCR) common stock as of January 1, 2017 is:

317.879315 shares at a value price of $307.71 per share.